RAQUEL MARGARITA PORRATA DORIA Y VEVE ET ALS., demandantes y apeladas, *v.* FAJARDO SUGAR COMPANY OF PORTO RICO y THE FAJARDO SUGAR GROWERS' ASSOCIATION, demandadas y apelantes.

Núm. 8119.—*Sometido:* Marzo 7, 1940. *Resuelto:* Noviembre 14, 1940.

---

* NOTA: Véase el prefacio.

*Jaime Sifre, Jr.*, abogado de las apelantes; *Cayetano Coll y Cuchí*, abogado de las apeladas.·

El Juez Asociado Señor Travieso emitió la opinión del tribunal.

La siguiente es una exposición concisa de los hechos probados, que consideramos esenciales para la decisión de este recurso.

En 23 de febrero de 1922 las aquí demandantes, dueñas de dos fincas rústicas con un total de 473.41 cuerdas, celebraron con la demandada Fajardo Sugar Company of Porto Rico un contrato de siembra, molienda y refacción por el cual las terratenientes se comprometieron a sembrar y cultivar por el término de diez años o cosechos, empezando con el de 1923 y terminando con el de 1932, un mínimum de cien (100) cuerdas de cañas, las que serían dadas a moler anualmente a la factoría de la corporación demandada. La cláusula vigésima tercera de la escritura contentiva de dicho contrato lee así:

"Vigésima tercera.—The Fajardo Sugar Company of Puerto Rico, representada en este acto por su apoderado y administrador general don Jorge Bird Arias, concede a doña María-Joaquina, doña Luz-Delia Silvia y doña Raquel-Margarita Porrata Doria y Veve, representadas también en este acto por su apoderado general don Guillermo Oppenheimer y Salomons, un crédito refaccionario por la suma de Diez Mil dólares para atender a los gastos de siembra, cultivo, recolección y demás necesarios para la refacción y administración de las plantaciones de caña a que se refiere este contrato."

En garantía del pago del expresado crédito refaccionario, las deudoras afectaron las cañas y el azúcar que habían de producir en las fincas y gravaron éstas con hipoteca por la suma de cinco mil dólares.

Durante los años económicos comprendidos entre 1922 y 1928, The Fajardo Sugar Company of Puerto Rico, a petición de las demandantes, pagó al Tesorero Insular las contribuciones impuestas a las dos fincas de las demandantes, con cargo a la cuenta de refacción. Las contribuciones correspondientes a los años fiscales 1928 a 1929 y 1929 a 1930 no fueron satisfechas por la corporación demandada, no obstante haber sido ésta requerida oportunamente para que las pagase en la forma acostumbrada. Embargadas las fincas por el Tesorero de Puerto Rico en cobro de las contribuciones adeudadas, en octubre 26 de 1931 se celebró la venta en pública subasta. El señor Eladio J. Candal, contador de la Fajardo Sugar Company y también de la Fajardo Sugar Growers'

Association, actuando de conformidad con instrucciones de don Jorge Bird Arias, administrador general de ambas entidades, compareció a la subasta y adquirió las dos fincas a nombre de la Fajardo Sugar Growers' Association, pagando el precio de la venta con un cheque expedido por la Fajardo Sugar Company.

Con posterioridad a la subasta de las fincas, en diciembre 12, 1931, a requerimiento de la Fajardo Sugar Company, se celebró un nuevo contrato de refacción por el cual dicha corporación concedió a las demandantes un nuevo crédito para la siembra y recolección de la cosecha de 1933. En la escritura se describen las fincas y se hizo constar que las mismas pertenecían a las demandantes, sin hacer mención alguna de su adquisición por la Fajardo Sugar Growers' Association. Por virtud de dicho contrato y en garantía del pago del crédito refaccionario, las hermanas Porrata *hipotecaron* a favor de Fajardo Sugar Company las participaciones que a cada una corresponden en las fincas. Los certificados de la venta fueron expedidos en diciembre 24 de 1931 e inscritos en el registro en febrero de 1932.

En julio 19, 1932, cuando faltaban aún cinco meses y cuatro días para la expiración del plazo de redención, el Sr. Bird, administrador general de las dos entidades demandadas, escribió a las demandantes una carta en la que les decía:

"Como verá usted por el estado de cuenta que le acompañamos, el cosecho 1932 se liquida adeudando $17,021.53 y en adición a esta cantidad los gastos efectuados en el cultivo de los retoños montantes a $2,915.38, o sea una deuda en cuenta de refacción de $19,936.91. Hemos hecho un presupuesto de los gastos que son necesarios para terminar el cultivo de las plantaciones para el próximo cosecho, y hemos calculado lo que se ha de gastar por otros conceptos hasta el corte de dichas cañas, y el montante de dicho presupuesto y gastos, más la deuda actual, será a la terminación del cosecho $40,000. Para el pago de estos $40,000 calculamos que la plantación dé un máximum de 6,600 toneladas de cañas, que contando con un mercado de azúcar mejor que el actual, a razón de $4 por tonelada, el valor de esta

producción montaría a $26,400, quedando por tanto un déficit en la cuenta refacción de $13,600.

"Por otro lado nos están adeudando sobre $31,000 en hipoteca, cerca de $11,000 en intereses de estas hipotecas, $6,600 del remate de las fincas por las contribuciones y un préstamo agrícola garantizado con su ganado y equipo de $3,200, haciendo estas partidas un total de $51,800. Los intereses del año, o sea de ahora hasta la terminación del cosecho próximo al 8 por ciento serán $4,100 más o menos."

En enero 11, 1933, quedó consumada en el registro la venta a favor de la Fajardo Sugar Growers' Association; y a petición del contador de ambas compañías demandadas, se cancelaron en el registro todos los gravámenes inscritos a favor de The Fajardo Sugar Company. En febrero 24 del mismo año, la asociación adquirente inició un procedimiento de desahucio que culminó en el lanzamiento de las demandantes.

En mayo 14 de 1934 las hermanas Porrata radicaron demanda en la cual exponen más detalladamente los hechos que ya hemos relacionado y piden se dicte sentencia a su favor con los siguientes pronunciamientos:

1. Declarando nula la venta hecha por El Pueblo de Puerto Rico a la Fajardo Sugar Growers' Association y ordenando la cancelación del certificado de dicha venta así como su inscripción en el registro.

2. Condenando a la Fajardo Sugar Company a pagar a las demandantes la suma de $35,000 por daños que alegan haber sufrido.

3. Condenando a la Fajardo Sugar Company a cargar a la cuenta de refacción de las demandantes la suma de $3,604.14, importe de las contribuciones pagadas en el remate de las fincas; a que rinda cuenta a las demandantes de todas las transacciones habidas entre las partes por virtud de los dos contratos de refacción; y al pago de costas y honorarios de abogado.

La teoría de las demandantes puede resumirse así:

Tanto las demandantes como la Fajardo Sugar Company consideraron que el pago de las contribuciones sobre las fincas objeto del contrato de refacción era una expensa necesaria para la administración de las cañas que habían de cultivarse

de acuerdo con dicho contrato; y de acuerdo con esa interpretación, durante todo el tiempo que duró dicho contrato dichas contribuciones fueron pagadas por The Fajardo Sugar Company, anualmente y cargadas a la cuenta de refacción de las demandantes. Al enterarse por los edictos publicados por el Tesorero de Puerto Rico que las contribuciones de 1928 a 1930 no habían sido pagadas por la Fajardo Sugar Company, acudieron las demandantes al administrador general de dicha compañía para que éste les informase sobre el motivo por el cual no se había hecho el pago, informándoles dicho administrador que dichas contribuciones serían pagadas como de costumbre y cargadas a la cuenta de refacción de las demandantes. Creyendo y confiando en las representaciones de la demandada, las demandantes, según ellas alegan, no hicieron gestión alguna a los fines de solventar las contribuciones pendientes. En vez de efectuar el pago de acuerdo con su ofrecimiento, la Fajardo Sugar Company acudió al remate y remató las fincas por el importe de las contribuciones, haciendo que el título fuese trasmitido a su afiliada Fajardo Sugar Growers' Association. Con posterioridad al remate de las fincas, acudieron las demandantes a las oficinas de la Fajardo Sugar Company en demanda de informes y fueron advertidas por el administrador general de las compañías demandadas de que el remate carecía de importancia, porque habíase realizado con el solo propósito de proteger los intereses de las demandantes, cargándoles como de costumbre el importe de las contribuciones en su cuenta de refacción. En esa última entrevista el administrador advirtió también a las demandantes que era necesario prorrogar el contrato de 23 de febrero de 1922, para que las demandantes pudiesen continuar sus trabajos agrícolas hasta la terminación del cosecho de 1933. Celebrado el nuevo contrato de refacción (diciembre 12, 1931) en él se reconoció como dueñas de los inmuebles a las demandantes. Con posterioridad a la subasta y a la celebración del nuevo contrato, las relaciones y negocios entre las partes siguieron su curso

normal, sin que en ningún momento las demandantes fueran en manera alguna advertidas por las demandadas de su intención de reclamar para sí el dominio de las fincas de las demandantes. Las actuaciones de las demandadas y la carta escrita por el Sr. Bird (supra) a las demandantes, en fecha anterior a la de la expiración del término de un año concedido por la ley a las demandantes para poder redimir la propiedad rematada, indujeron a las demandantes a creer que la propiedad había sido rematada para su beneficio, con la obligación por su parte de devolver a la Fajardo Sugar Company el importe de las contribuciones por ella pagadas.

Las demandadas han negado los hechos esenciales de la demanda y especialmente que la Fajardo Sugar Company se hubiese obligado en manera alguna a pagar las contribuciones sobre las fincas de las demandantes. La Fajardo Sugar Company negó específicamente que en momento alguno ella pagara las contribuciones sobre las fincas de las demandantes o que cargara a la cuenta de éstas el importe de las contribuciones. La Fajardo Sugar Growers' Association insiste en que el título por ella adquirido es válido y que ella es la dueña absoluta de las propiedades adquiridas en su nombre en la subasta.

Visto el caso ante la Corte de Distrito de Humacao dictó ésta sentencia a favor de las demandantes en cuanto a la primera causa de acción, decretando en consecuencia que las fincas ''nunca han dejado de ser y que continúan siendo de la propiedad de las demandantes en este caso'' y ordenando a la demandada The Fajardo Sugar Growers' Association que transmita a favor de dichas demandantes el título que ahora ostenta sobre las propiedades, ''el cual se declara nulo.'' La sentencia condena a las demandadas al pago de costas, más $5,000 de honorarios de abogado. No conformes, las demandadas han interpuesto el presente recurso.

Alegan las apelantes que la corte sentenciadora incurrió en ocho errores, a saber:

1. Al resolver que el pago de las contribuciones era un gasto necesario para la refacción y administración de las fincas.

2. Al resolver que la cláusula 23 del contrato de refacción impuso a la Fajardo Sugar Company la obligación de satisfacer las contribuciones impuestas a las fincas.

3. Al resolver que la Fajardo Sugar Growers' Association no pudo legalmente concurrir a la subasta de las fincas por impedírselo los vínculos contractuales existentes entre las dueñas de las fincas y la Fajardo Sugar Company of Porto Rico.

4. Al resolver que el remate y adquisición de las fincas por la Fajardo Sugar Growers' Association careció de eficacia legal por haberse verificado de mero modo formal, habiéndose efectuado el pago de las contribuciones por la Fajardo Sugar Company por mediación de la Fajardo Sugar Growers' Association a nombre de las demandantes y con cargo a la cuenta de refacción de éstas.

5. Al apreciar la prueba.

6. Al declarar nulos e inexistentes los títulos de la Fajardo Sugar Growers' Association sobre las fincas en litigio.

7. Al declarar con lugar la demanda en cuanto a su primera causa de acción y al decretar que las fincas nunca dejaron de ser y continúan siendo de la propiedad de las demandantes apeladas.

8. Al imponer a las apelantes el pago de las costas y honorarios, y especialmente al fijar el importe de los mismos en la suma de $5,000.

■■ Los dos primeros señalamientos no presentan cuestión legal alguna que merezca seria consideración. Nos sentimos inclinados a opinar que el pago de las contribuciones por el dueño de una finca objeto de un contrato de refacción es un gasto necesario e imprescindible para la debida administración de la finca y para la protección de los intereses tanto del dueño del inmueble como del acreedor refaccionista. No podemos concebir que un acreedor de tal naturaleza no tenga interés en que se paguen preferentemente las contribuciones sobre el inmueble en que han de sembrarse y cultivarse los frutos que le garantizan el pago del préstamo, sabiendo la preferencia que la ley concede al Pueblo de Puerto Rico para el cobro de contribuciones. Si aceptásemos que la corte inferior erró al considerar tal pago como un "gasto necesario de administración," el error no sería a

nuestro juicio causa suficiente para la revocación de la sentencia recurrida. Tampoco es causa de revocación el error en que a nuestro juicio incurrió la corte inferior al sostener que la cláusula 23 del contrato de refacción impuso a la Fajardo Sugar Company la obligación de pagar las contribuciones y cargarlas a la cuenta de refacción. La evidencia demuestra fuera de toda duda que durante el término cubierto por el contrato de refacción la Fajardo Sugar Company, siempre que fué requerida por las dueñas de las fincas para que pagase con cargo a la cuenta de refacción las contribuciones impuestas a las fincas, las pagó, cargando el importe a la indicada cuenta, con excepción de las contribuciones de los dos años del 1928 a 1930, cuando dicha corporación se negó a hacer el pago en la forma acostumbrada.

No estando legalmente obligada la Fajardo Sugar Company a efectuar el pago de las contribuciones sobre las fincas de las demandantes, opinamos que no existe razón legal alguna que impidiera a dicha corporación o a su afiliada la Fajardo Sugar Growers' Association acudir a la subasta como cualquier otro postor y adquirir las fincas para sí mediante el pago de la suma adeudada al Tesoro Insular. Si la concurrencia a la subasta se hubiese verificado abiertamente, en forma tal que resultase evidente el propósito firme de la compradora de adquirir para sí las fincas ofrecidas en pública subasta, nos sentiríamos obligados a resolver que el título adquirido por la Fajardo Sugar Growers' Association es válido e inexpugnable. Los hechos y circunstancias que surgen de la evidencia y que analizaremos más adelante nos llevan inflexiblemente a otras conclusiones. El error consignado en el tercer señalamiento fué sin duda alguna cometido, pero tratándose de un mero razonamiento, opinamos que dicho error no es perjudicial y que debemos desestimarlo si los pronunciamientos esenciales de la sentencia están sostenidos por la ley y por la evidencia.

Creemos innecesario hacer aquí una exposición detallada de la prueba documental y testifical ofrecida por una y otra

parte. Nos limitaremos a examinar críticamente aquella parte de la evidencia relacionada con las actuaciones de las partes antes y después de la subasta de las fincas.

Ya hemos hecho constar que las demandantes, como dueñas de las fincas, tenían la obligación de pagar las contribuciones; y que la Fajardo Sugar Company no se obligó a pagarlas. La evidencia demuestra de manera convincente que las partes contratantes establecieron la práctica de que cuando las dueñas del inmueble pedían a la central que pagase las contribuciones, ésta las pagaba con cargo a la cuenta de refacción, sin duda alguna porque estimaba que ésa era una expensa legítima y necesaria para proteger los intereses de ambas partes. Es cierto que la corporación demandada se negó al ser requerida a pagar las contribuciones para el cobro de las cuales se había anunciado la subasta de las fincas. Examinemos los hechos ocurridos con posterioridad a esa negativa.

El Sr. José Vahamonde, testigo de las demandantes, declaró que él intervino para tratar de arreglar las dificultades entre las hermanas Porrata Doria y la Fajardo Sugar Company, y continuó diciendo:

"P. ¿Pero en la conversación que tuvo usted con el Sr. Bird sobre la cuestión del pago de las contribuciones y el remate de la finca, cómo fué esa conversación, qué le dijo a usted el Sr. Bird sobre la posibilidad de que la Fajardo rematara esa finca?

"R. Bueno, eso fué otra vez, la primera intervención fué ésa.

"P. Continúe.

"R. Entonces volví a Fajardo a las tres o cuatro semanas y mamá insistió otra vez que yo fuera, volviera a hablar y demás, yo no quería intervenir en ese asunto porque yo sabía cómo estaban esos asuntos y ella no podía hacer nada, todo se reducía a pagar la cantidad que ellas debían, solventar la deuda para poner la finca a flote y nosotros no podíamos hacer eso, entonces la finca se había rematado por las contribuciones en esa época ya, y estuve yo, había venido de New York también una de las hermanas, Raquel, la más joven y vino un día a mi casa con un poder que ella había hecho a favor mío para que yo le representara, yo no quise aceptar el poder y le dije: 'Yo te ayudo en todo lo que pueda, pero yo tengo muchas

cosas entremanos, no me es posible'; 'No, yo quiero que tú vayas a hablar con Jorgito Bird porque esta finca la van a rematar por contribuciones y nosotros no tenemos dinero, y no sea cosa que nosotros vayamos a perder la finca por las contribuciones,' entonces yo fuí a hablar con don Jorge y le dije la comisión que llevaba, fuí con Augusto Márquez que me acompañó y me contestó: 'Tú le dices a Raquel de mi parte que ella puede tener la seguridad de que yo no voy a quedarme con la finca por las contribuciones,' no me acuerdo si ya se había rematado o esto fué antes del remate,—'que yo voy a rematar la finca para proteger los intereses de la compañía porque puede venir cualquiera otra persona, ir y rematarla,' y entonces están estos créditos, porque no podíamos hacerlos efectivos, porque las contribuciones entonces nos matan todo, entonces yo fuí y le dí cuenta a mi prima de mis gestiones acerca de eso, pero ella insistió en que fuera una contestación más categórica, que se le diera por escrito o algo así, claro yo no podía obligar a don Jorge a que me diera una contestación escrita de lo que habíamos hablado, solamente tenía que acudir o apelar a su caballerosidad de lo que me había dicho, y después de eso ya se había rematado la finca, meses después se había rematado la finca, y estuve yo otra vez allá, no me acuerdo con qué motivo, yo tengo relaciones con la Fajardo, contrato de siembra y molienda, y no sé cómo vino a conocimiento de mi madre que ellas no podían moler sus cañas de esa cosecha porque no tenían refacción y demás, entonces intervine yo y fuí a hablar con la Fajardo a ver si ellos permitían que yo ayudara con el dinero que ellas necesitaban para moler las cañas que tenían, y desde luego abonando el importe de esas cañas a la central y resarciéndome yo del dinero que gastara en molarlas puesto que lo que yo hacía era intervenir a que se molieran esas cañas porque no tenían ellas dinero para hacerlo y llegamos a una transacción en la cual las señoras Porrata le vendían la finca a mamá...

''P. ¿Antes de eso volvió Ud. a hablar sobre la cuestión de contribuciones, don Jorge y usted?

''R. En esas dos veces solamente.

''P. Usted nos explicó la primera vez que habían hablado, ¿cuándo fué la segunda vez que volvieron a hablar?

''R. Me parece que ya se había rematado la finca.

''P. ¿Qué le dijo el Sr. Bird después que se había rematado la finca?

''R.—Que ellos no pensaban quedarse con la finca, si ellas conseguían el dinero y se lo devolvían estaban dispuestos a traspasarle los títulos. Nada más, Sr. Juez.''

El Sr. Augusto O. Márquez, después de declarar sobre las gestiones que hiciera para conseguir que la Fajardo Sugar Company pagase las contribuciones y evitase el remate, continuó declarando así:

"P. ¿Qué sucedió el día del remate?

"R. Yo le voy a decir lo que pasó el día antes del remate.

"P. ¿El día antes del remate?

"R. El día antes del remate estuve yo en la central a ver al Sr. Candal, hablé extensamente con él sobre la posibilidad de que nos diera ese dinero, después de hablar con el Sr. Candal de quien no obtuve nada hablé con Veve y tampoco obtuve nada del Sr. Veve quien me sugirió que volviera a ver a don Jorge, don Jorge en ese momento no estaba en la oficina y no lo ví ese día. El mismo día del remate por la mañana estuve yo en la oficina y fuí directamente donde don Jorge y le expuse los motivos que yo tenía para insistir en que él me diera ese dinero para el pago de las contribuciones y me explicó que no era posible, en esa conversación le dije yo a don Jorge: 'Don Jorge y si usted manda a rematar esa finca.'

"Juez

"P. ¿Cómo?

"R. Y si usted manda a rematar esa finca, yo le dije a don Jorge, y me dijo: 'Parece mentira que usted piense eso porque es lo más lejos que está de mi imaginación, porque yo he sido así con esta familia y no es ése mi propósito.'

"Demandantes.

"P. ¿Eso se le dijo a usted en la mañana del remate el Sr. Bird?

"R. En la mañana del remate como a las ocho y media o nueve de la mañana.

"P. Continúe.

"R. Y sobre la negativa final de don Jorge me fuí yo a la colecturía a ver qué pasaba con el remate y estando yo allí ví que llegó el Sr. Candal con el cheque de las contribuciones, después que se hizo el pago, el Sr. Candal le pagó al colector, inmediatamente regresé yo a la Fajardo y protesté ante don Jorge de la acción que me había hecho.

"P. ¿Y qué le dijo a usted el Sr. Bird?

"R. Que no era la intención de ellos coger la finca por las contribuciones, que esperara la terminación de esa próxima cosecha a ver el resultado de ese cosecho y entonces cargar eso en cuenta, y entonces volver las cosas a su estado primitivo."

Las declaraciones precedentes, las cuales no fueron controvertidas por declaración alguna del Sr. Bird, y la carta escrita por éste a las demandantes son a nuestro juicio suficientes para justificar la conclusión a que llegó la corte sentenciadora al efecto de que las manifestaciones orales y por escrito hechas por el administrador general de la Fajardo Sugar Company y de la Fajardo Sugar Growers' Association a las demandantes, indujeron a éstas a creer que el remate de las fincas había sido hecho para su beneficio y que el título sobre dichas fincas les sería devuelto al hacerse la liquidación final del contrato de refacción, pagando ellas desde luego el precio del remate satisfecho por la Fajardo Sugar Company.

¿Si la intención y el propósito de los representantes de las demandadas, al acudir al remate, eran liquidar y cerrar de una vez sus cuentas con las demandantes, rematando las fincas a nombre de una de las demandadas, convirtiendo a ésta en dueña absoluta de las fincas al expirar el plazo de redención y cancelando todos los gravámenes constituídos por las demandantes a favor de la Fajardo Sugar Company, por qué no se reveló claramente a las demandantes el plan concebido, cuando éstas insistieron repetidas veces para que la Fajardo Sugar Company pagase las contribuciones con cargo a la cuenta de refacción, en vez de inducirlas a creer que la corporación demandada no abrigaba la intención de quedarse con las fincas por el importe de las contribuciones o por el importe de una deuda que no había sido aún liquidada?

¿Si la Fajardo Sugar Growers' Association acudió al remate como un simple postor, con entera independencia de la Fajardo Sugar Company y con el propósito de adquirir para sí las fincas ofrecidas en venta, por qué tenía el Sr. Bird, administrador general de ambas entidades, que informar a las demandantes que éstas estaban adeudando a la Fajardo Sugar Company of Porto Rico "$6,600 del remate de las fincas por las contribuciones?" Si la Fajardo Sugar Growers' Association compró las fincas de buena fe para sí con

fondos suministrádosle por la Fajardo Sugar Company, la deudora del importe pagado por la Fajardo Sugar Company en el acto de la subasta debería ser natural y lógicamente la Fajardo Sugar Growers' Association y no las demandantes. ¿Por qué, pues, se avisó a las demandantes que eran deudoras a la Fajardo Sugar Company de una suma de $6,600, si dicha suma no fué pagada para su beneficio? ¿Por qué, pues, se cargó a la cuenta de las demandantes que se detalla en la carta del Sr. Bird, una suma pagada para beneficio de la Fajardo Sugar Growers' Association, no existiendo relaciones contractuales entre dicha asociación y las demandantes?

No encontramos que la corte inferior haya errado en la apreciación de la evidencia. Examinada y pesada ésta en conjunto, nos lleva a la conclusión de que el plan primordial de la Fajardo Sugar Company fué el siguiente: Temerosos los administradores de la Fajardo Sugar Company de que las hermanas Porrata Doria no pudiesen solventar a su vencimiento la obligación refaccionaria y las hipotecas por ellas constituídas sobre las fincas, al enterarse de que las fincas serían vendidas en subasta pública por falta de pago de contribuciones, acudieron a la subasta con el propósito expresado por el Sr. Bird en su carta de julio 19 de 1932 y en sus entrevistas con los señores Vahamonde y Márquez, o sea el de comprar las fincas por el importe de las contribuciones, para evitar que fuesen adquiridas por un extraño, protegiendo así los intereses de las dueñas de los inmuebles y los de la central como acreedora refaccionista e hipotecaria. Confiando en que la central no intentaba quedarse con las fincas por el importe de las contribuciones, las hermanas Porrata Doria celebraron el nuevo contrato de refacción, continuaron cultivando las cañas para el cosecho de 1933 y dejaron transcurrir el año que la ley concede a los dueños de fincas rematadas por contribuciones para redimirlas. Todo parece indicar que el propósito de la compañía era el de conservar las propiedades para beneficio de las demandantes, para ser-

les traspasadas de nuevo al liquidarse definitivamente las cuentas de la refacción.

Fué sin duda alguna después de ocurrido el ciclón de 1932, que mermó considerablemente el cosecho de 1933, cuando la Fajardo Sugar Company, temerosa de no poder cobrar íntegramente las sumas adeudadas por las demandantes, alteró el plan original y resolvió reclamar para sí—o para su afiliada la Fajardo Sugar Growers' Association—la propiedad ·o dominio absoluto de las fincas. El nuevo *modus operandi* ·era en verdad más rápido y sumario que el original, pues ·con él la compañía acreedora obviaba las dificultades y dila·ciones de una liquidación de cuentas y los trámites judiciales necesarios para la ejecución de los créditos hipotecarios. No es posible que demos nuestra aprobación a tales tácticas. Habiendo optado por la adquisición de las fincas para beneficio de las partes interesadas en el contrato de refacción y habiendo por sus declaraciones y actos antes y después del remate inducido a las demandantes a creer que sus intereses ·estaban debidamente protegidos, las demandadas apelantes ·están ahora impedidas (*estopped*) para cambiar a su arbitrio la situación legal originalmente por ellas creada.

Existe cierta incongruencia en la sentencia dictada por la corte inferior. Por ella se ordena a la Fajardo Sugar Growers' Association que transmita a las demandantes "el título escrito que ahora ostenta sobre las fincas objeto de esta acción, las cuales continuarán sujetas a las mismas responsabilidades legales que las gravaban a la fecha en que se consumó el título de dicha demandada, *que ahora se anula.*" No es posible sostener que el título que ostenta la Fajardo Sugar Growers' Association es nulo. Habiendo sido adquirido después de una venta pública legalmente celebrada, por una entidad capacitada para contratar, debemos resolver que el título que ostenta la referida demandada es perfectamente válido, pero sujeto desde luego a las responsabilidades resultantes de la situación jurídica creada por los actos y conducta de las partes contratantes. La corte·inferior parece haber tenido

en mente que el título era nulo en cuanto por él se pretendía convertir a la Fajardo Sugar Growers' Association en dueña absoluta de las fincas, pero válido y subsistente para poder ser transmitido a las dueñas de las fincas, las demandantes. La sentencia recurrida debe ser modificada en cuanto al indicado extremo.

■ A nuestro juicio el remedio aplicable a la situación jurídica creada entre las partes por las manifestaciones y actuaciones de las demandadas a través de sus directores, agentes y administradores es el restablecimiento del statu quo existente con anterioridad a la venta de las fincas en pública subasta, restituyendo las fincas a sus dueñas, las demandantes, quienes las recibirán y poseerán sujetas a los gravámenes por ellas constituídos y a la responsabilidad de reintegrar a la Fajardo Sugar Company la cantidad por ella pagada como precio de la venta en pública subasta, más los intereses correspondientes. La doctrina aplicable al caso de autos es la del fideicomiso constructivo (*constructive trust*).

"*Constructive Trust*. Cuando una persona que ostenta el título sobre una propiedad está sujeta a una obligación equitativa de transmitir esa propiedad a otra persona por la razón de que se enriquecería injustamente si se le permitiese retenerla como suya, surge un fideicomiso constructivo. . ."

"Un fideicomiso constructivo no surge, cual ocurre con el fideicomiso expreso, como consecuencia de una manifestación de la intención de crearlo, sino que es impuesto como un remedio legal para impedir un enriquecimiento injusto." Restatement of the Law—Restitution, párr. 160, págs. 640, 641.

"d. *Enriquecimiento injusto y despojo injusto*. En la mayoría de los casos en que se impone un fideicomiso constructivo, el resultado es devolver al demandante la propiedad de la cual ha sido injustamente privado y quitarle al demandado una propiedad cuya detentación resultaría en el correspondiente injusto enriquecimiento del demandado; en otras palabras, el efecto es evitar una pérdida al demandante y la consiguiente ganancia al demandado, y colocar a cada uno de ellos en la posición en que se encontraba antes de que el demandado adquiriese la propiedad.

"e. *Remedios legales y de equidad.* Cuando una persona tiene una propiedad sujeta a un fideicomiso constructivo para beneficio de otra, esta última tiene el interés sobre la propiedad como beneficiario. En muchos casos el beneficiario de un fideicomiso constructivo puede por medio de un procedimiento en equidad obligar al fiduciario (*constructive trustee*) a que le transfiera la propiedad; tiene derecho al cumplimiento específico del fideicomiso." Restatement of the Law—Restitution, págs. 643 y 644.

Considerando que la suma de $5,000 concedida por la corte inferior como honorarios de abogado es excesiva y habida cuenta de las circunstancias especiales del caso, opinamos que dicha suma debe ser reducida a $1,500.

*Por las razones expuestas, la sentencia recurrida debe ser modificada para conformarla a esta opinión y así modificada confirmada.*

El Juez Asociado Sr. Wolf disintió.